**Paula BOWEN, Plaintiff,**

v.

**VALLEY CAMP OF UTAH, INC., a Utah corporation, Defendant.**

**Civ. No. C83–0890G.**

United States District Court, D. Utah, C.D.

July 16, 1986.

Sam N. Pappas, William R. Russell, Salt Lake City, Utah, for plaintiff.

Chris Wangsgard, David J. Jordan, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION

**J. THOMAS GREENE, District Judge.**

This matter came on regularly for non-jury trial on April 30, 1986. Plaintiff was represented by Sam N. Pappas and William R. Russell, and the defendant was represented by Chris Wangsgard and David J. Jordan. The trial continued from day to day and concluded on May 2, 1986. Extensive evidence was presented by both sides, after which the matter was ably argued by counsel and the case taken under advisement. The Court having adopted Findings of Fact and Conclusions of Law, supplements its Findings and Conclusions with a Memorandum Opinion which sets forth ad-

ditional factual and legal bases for its decision. The Court will not reiterate all of the Findings of Fact and Conclusions of Law, but incorporates them by reference herein.

## NATURE OF THE ACTION

Paula Bowen (hereinafter "plaintiff") brought this action against Valley Camp of Utah, Inc. (hereinafter "defendant") alleging violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. That Section makes it an

> unlawful employment practice for an employer (1) to fail or refuse to hire or to *discharge* any individual or otherwise *discriminate* against any individual with respect to his compensation, terms, conditions, or privilege of employment, because of such individual's race, color, religion, *sex*, or national origin.[1]

42 U.S.C. § 2000e–2(a) (Emphasis added).

Plaintiff's claim is based upon her termination of employment with defendant. After having taken several months leave due to pregnancy, and shortly before she was to return to work, plaintiff was notified of the termination. Defendant's given reason for the termination was the lack of an available position for plaintiff. The facts show that defendant permanently replaced plaintiff shortly after she began her leave of absence.

### Applicable Legal Principles

A. Allocation of Burdens

The case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) sets forth the allocation of burdens between the parties in a disparate treatment[2] employment discrimination case.[3] The employee has the initial

---

1. Defendant has not denied and the Court has found that it is an "employer" within the meaning of the Act or that plaintiff is an "employee" within the meaning of the Act.

2. A disparate treatment case requires a showing through direct or circumstantial evidence of an intent to discriminate or in other words a showing that the employer was motivated by an improper and discriminatory purpose in his conduct.

3. Regarding the allocation of burdens in a discharge case, the Tenth Circuit has stated:
 > The three-step analysis of discrimination claims established in *McDonnell Douglas* has repeatedly been applied to discriminatory discharge cases. *See, e.g., Lujan v. New Mexico Health and Social Services Department,* 624

burden to establish a prima facie showing of the employer's discrimination.[4] Once such a showing is made, the burden of production shifts to the employer to articulate "some legitimate nondiscriminatory reason" for the conduct in question. If the employer succeeds, the burden of production shifts back to the employee to show that the reasons articulated by the employer were mere pretexts for discrimination. 411 U.S. at 804, 93 S.Ct. at 1825. *See Nulf v. International Paper Co.*, 656 F.2d 553 (10th Cir.1981) (discussing *McDonnell Douglas Corp.* in the context of a case of alleged employment discrimination based on gender). Despite the shifting of the burden of production, the burden of persuasion remains with the plaintiff throughout the case. *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**B. Prima Facie Case**

**1. Generally**

■ To establish a prima facie case under *McDonnell Douglas* in a dismissal action, the plaintiff must show that "(1) she was a member of a group protected by Title VII, (2) she was qualified for the job, (3) she was fired despite her qualifications, and (4) after she was fired her job remained open and her employer sought applicants whose qualifications were no better than [plaintiff's] qualifications." *Crawford v. Northeastern Okl. State Univ.*, 713 F.2d 586 (10th Cir.1983) (discussing with approval the lower court's applied standard

F.2d 968, 970 (10th Cir.1980); *Reed v. Marshall*, 626 F.2d 43, 45 (8th Cir.1980); *Ray v. Safeway Stores, Inc.*, 614 F.2d 729, 730–31 (10th Cir.1980). [Plaintiff] was required to present a prima facie case of discriminatory discharge and to prove that any legitimate, nondiscriminatory reason articulated for the discharge was merely a pretext for discrimination. . . .
*Nulf v. International Paper Co.*, 656 F.2d 553, 559 (10th Cir.1981).

4. 411 U.S. at 802. Regarding the rationale behind the requirement of a prima facie showing, the Tenth Circuit has stated: "The function of the *prima facie* case is to eliminate 'the most common nondiscriminatory reasons for the

but reversing the trial court's findings on the prima facie case). The Tenth Circuit has not suggested that the elements of a prima facie showing in a dismissal action should change in either substance or form where the alleged discrimination is based on pregnancy or on plaintiff's taking leave due to pregnancy. Some variation of the elements to "fit" particular factual situations may avoid anomolous or unjust results which would do injustice to the concept of and purpose for establishing a prima facie case.

**2. Pregnancy—Related Termination**

■ The allegations herein are centered on the provision of the Pregnancy Discrimination Act, which states:

[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability to inability to work. . . .

42 U.S.C. § 2000e(k). Simply stated, a prima facie case of discrimination based on pregnancy requires a showing that plaintiff was a member of a protected class under the Act, that she was qualified for and was performing the job, and was terminated based on her pregnant condition. *Iodice v. Southeastern Packing & Gaskets*, 572 F.Supp. 1370, 1375 (N.D.Ga.1983). Regarding the last element, plaintiff must establish, at least by inference,[5] that the termi-

plaintiff's rejection.'" *Mohammed v. Callaway*, 698 F.2d 395, 398 (10th Cir.1983) (citation omitted), *cited in Crawford v. Northeastern Oklahoma State Univ.*, 713 F.2d 586, 588 (10th Cir. 1983).

5. Direct evidence of discriminatory intent is unlikely to arise in the plaintiff's case. As this Court has stated,

Discrimination as a motivation for one's actions is seldom admitted and is often cloaked in thin robes of what the law deems legitimate. For that reason, evidence of discrimination in most contexts will be indirect or circumstantial. The United States Supreme Court recognized early on the problems of proof extant in such an inquiry.

nation was because of her pregnant condition. The prima facie standard is not met by simply showing that plaintiff was pregnant and was terminated when she began her maternity leave. One possible way plaintiff might establish the said last element of the prima facie case would be by showing that either she was treated differently than were other employees under fringe benefits programs, such as a disability or sick leave program, or that she was denied benefits others received pursuant to such programs.[6] *See Conners v. University of Tenn. Press*, 558 F.Supp. 38, 40 (E.D. Tenn.1982). ("The denial of a leave of absence because of temporary pregnancy complications violates Title VII when leaves are generally granted for non-pregnancy related disabilities," citing *St. John v. G.W. Murphy Industries, Inc.*, 407 F.Supp. 695 (W.D.N.C.1976)).

### 3. Sexual Harassment Termination

Plaintiff, in her trial brief, has also urged a claim based on sexual harassment.[7] At the time this action was tried, neither this District nor the Tenth Circuit had addressed whether and to what extent a claim of sexual harassment is contemplated by Title VII. However, in the recent case of *Meritor Savings Bank v. Vinson*, —— U.S. ——, 106 S.Ct. 2399, 90 L.Ed.2d —— (1986), the United States Supreme Court addressed the precise issue of whether the Congressional prohibition of discrimination with respect to "compensation, terms, conditions, or privileges" of employment contemplates only tangible loss of an economic character, as opposed to the employee's loss of psychological wellbeing at her workplace. The Court pointed out that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition or privilege' of employment within the meaning of Title VII.... for sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at ——, 106 S.Ct. at 2406 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 400 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 243 (1972)). Activity which constitutes sexual harassment includes "unwelcome sexual advances, requests for sexual favors and often verbal or physical conduct of a sexual nature." *Id.* at ——, 106 S.Ct. at 2405 (quoting 29 C.F.R. 1604.11(a) (1985)).

The Supreme Court did not address whether its holding in *McDonnell Douglas* regarding the allocation of burdens applies to a case of sexual harassment.[8] It is reasonable to assume, however, that a discrimination claim based on

---

*Branson v. Price River Coal Co.*, 627 F.Supp. 1324, 1328 (D.Utah 1986) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

**6.** Plaintiff has no complaint against defendant based on the wording of defendant's employee benefits program. The program provides for disability and maternity leave with full reinstatement. Therefore the Court need not address questions of when employers must provide maternity leave programs or how broad those programs must be.

**7.** This claim was not spelled out as an actionable claim in the pretrial order and defendant objected strenuously to admission of evidence of sexual harassment. However, plaintiff presented evidence of alleged sexual harassment only to show that the employer's stated, legitimate nondiscriminatory reasons for her termination were pretextual.

**8.** In the case of sexual harassment where the alleged injury is hostile environment, the conduct of sexual harassment itself may be regarded as offensive per se and violative of the Act. In such a case, an employer may be unable to articulate legitimate non-discriminatory reasons for such sexual harassment. (Other defenses would still be available in such cases in addition to the employer denying that sexual harassment took place. The Supreme Court found that employers are not absolutely liable for the acts of supervisors in matters of sexual harassment but instead are liable only to the extent that agency principles apply. *Vinson* at ——, 106 S.Ct. at 2407–08 (citing Restatement (second) of Agency, §§ 219–237 (1958)). Citing extensively from EEOC guidelines and lower case authority, the court found the possibility of two types of prohibited sexual harassment. First, where sexual harassment "is directly linked to the grant or denial of an economic quid pro quo." 29 C.F.R. 1604.11(a)(3) (1985), the act clearly proscribes such conduct. *Vinson* at ——, 106 S.Ct. at 2407–08. Second, Title VII equally prohibits sexual harassment that creates a hostile or offensive work environment for members of one sex

sexual harassment where the alleged injury includes failure to hire, termination, demotion or failure to promote (because plaintiff rebuffed her supervisor's advances) the employer ought still to be given the opportunity to articulate legitimate non-discriminatory reasons for its conduct. A prima facie case of sexual harassment against the employer, for purposes of *McDonnell Douglas* analysis, would include the following: (1) the employee is a member of a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of affected a "term, condition, or privilege" of employment (quid pro quo or created a hostile environment), and (4) the employer is subject to liability based on agency principles. See *Henson v. City of Dundee,* 682 F.2d 897, 903–05 (11th Cir.1982); *Vinson* at 2405.

## C. Strict Liability for Termination of Pregnant Woman

A substantial question before this court is the meaning and effect under the law of plaintiff's termination while she was on maternity leave. Plaintiff asserts a position of strict liability by claiming that once defendant allowed plaintiff to take maternity leave defendant was legally bound to keep her position open for plaintiff's return. The plaintiff relied upon E.E.O.C. guidelines set forth in Title 29 of the Code of Federal Regulations. The applicable provision is found in an Appendix containing hypothetical situations and responses as to how the law should govern them. Question and answer "9" read as follows:

Q. Must an employer hold open the job of an employee who is absent on leave because she is temporarily disabled by pregnancy-related conditions?

A. Unless the employee on leave has informed the employer that she does not intend to return to work, her job must be held open for her return on the same basis as jobs are held open for employees on sick or disability leave for other reasons.

29 C.F.R. 1604 app.

■ The Court is not persuaded that this provision would preclude an employer from articulating legitimate nondiscriminatory reasons for terminating a woman while she was on maternity leave, even where the employer had not terminated other employees who had taken extensive disability leaves. Otherwise, an employer who was dissatisfied with an employee's work performance and had exercised legitimate, business judgment to terminate her would not be willing to allow that employee to obtain maternity leave benefits prior to her termination. She would be notified of the termination immediately and may be denied benefits. Although such an exception could accommodate very few fact situations, the result otherwise would be anomolous and would instill in employers greater self protectionism to the exclusion of benificence.

The Court is of the opinion that Question and Answer 9, quoted above, simply shows that an employer is precluded from treating otherwise similarly situated employees differently. Where the employee is not in good stead with her employer, and the employer has determined to terminate her she is not similarly situated with other employees and the law does not prevent the employer from extending benefits the employee would be denied were she terminated immediately.

## ANALYSIS

### A. Plaintiff's Termination

#### 1. Prima Facie Case

■ The first question is whether plaintiff proved a prima facie case of sex dis-

---

(non-quid pro quo). *Id.* The court reasoned that:

Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the work place that racial harassment of racial equality. Surely, a requirement that a man or woman run a gauntlet of

sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Id.* at 2406 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 901 (11th Cir.1982) and citing *interalia Bundy v. Jackson,* 641 F.2d 934, 943–46 (D.C.Cir.1981)).

crimination. This Court believes that she did so. Plaintiff clearly is a member of a protected class under the Act. Plaintiff has shown that she was qualified for and was performing her job, although she may not have been performing it to the complete satisfaction of her employer. Plaintiff was terminated from her job and she was notified of that termination shortly before she planned to return to work. In fact, plaintiff was permanently replaced within one month of the time she began her maternity leave. Finally, defendant's disability leave benefits ostensibly treated pregnancy-related conditions the same as other conditions requiring time off from work. Under the plan, people who encountered disability would not be terminated but would receive benefits and then would be reinstated at the same or similar employment. The evidence is sketchy on whether plaintiff actually was treated differently than other employees who took leaves of absence. Plaintiff presented at least one example of how another employee who took a leave of absence was treated, but that example was inconclusive because of the particular facts of that situation. However, based upon the terms of the disability plan itself, plaintiff was not treated the same as other employees who took disability leaves would be treated. For this reason the Court believes that plaintiff raised an inference of intentional discrimination based on plaintiff's pregnant condition.

### 2. Employer's Burden

■ The next question is whether the defendant articulated legitimate, nondiscriminatory reasons for terminating plaintiff. The court is of the opinion that it did so. The Court will not reiterate all of the facts set forth on this point in its Findings of Fact. However, the Court is persuaded that plaintiff's supervisor became increasingly dissatisfied with plaintiff's job performance to the point that he decided to discharge her. The decision to terminate plaintiff was made prior to her taking maternity leave and it was not motivated by the fact that she was a woman, was pregnant, or was going to take maternity leave. The evidence shows that defendant decided not to notify plaintiff of her termination until and unless she decided to return to work. That way, plaintiff would be able to enjoy disability benefits and defendant might be able to avoid the uncomfortable situation of having to terminate an employee should plaintiff choose not to return to work. Plaintiff was permanently replaced by a woman shortly after she began her leave of absence.

### 3. Pretext

■ The final question is whether plaintiff demonstrated that defendant's proferred reasons for plaintiff's discharge were mere pretexts for discrimination. The court believes that plaintiff failed to do so. The Tenth Circuit has stated that a plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proferred explanation is unworthy of credence." *Beck v. Quiktrip Corp.,* 708 F.2d 532, 535 (10th Cir.1983). Plaintiff's evidence on this point essentially followed two lines. First, plaintiff presented evidence that she was qualified for her job and that she was performing her job in a satisfactory manner. Second, plaintiff presented testimony of instances where her supervisor told stories and jokes having sexual connotation and instances where her supervisor invited plaintiff, as she interpreted them, to engage in sexual relations with him.[9] Plaintiff declined these invitations. The Court was persuaded that plaintiff was qualified for her job. However, regardless of whether defendant's decision to terminate plaintiff was reasonable, the Court is convinced that it was based on defendant's legitimate business judgment because of dissatisfaction with her job performance. Regarding the alleged instanc-

---

9. The invitations included an invitation to go with him to an out-of-state football game, to go to a company cabin for a drink and to wash his back in the shower at the office.

es of sexual harassment, the Court is not persuaded that a condition of plaintiff's continued employment was that she become sexually involved with her supervisor. In other words, even assuming plaintiff's version of the facts as true, the plaintiff's lack of consent to have sexual relations with her supervisor was not a determining factor in her supervisor's dissatisfaction with her job performance, and decision to terminate her. For these reasons, the plaintiff has failed to carry the ultimate burden of persuasion.

B. Sexual Harassment

 No separate claim for relief for sexual harassment under Title VII was framed in the Pretrial Order. However, plaintiff presented evidence or sexual harassment to show pretext. As discussed above, the Court was not persuaded that such evidence showed that a discriminatory reason more likely motivated her employer's conduct or that defendant's proferred reason was unworthy of credence. Had a claim of sexual harassment been properly framed, the Court's ruling would have been the same on the question of whether the harassment affected a "term, condition or privilege" of employment—assuming that the term, condition or privilege was her continued employment.

Based upon the foregoing, judgment is awarded to defendant and against plaintiff—no cause of action. The parties shall bear their own costs and attorney's fees.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on regularly for nonjury trial on April 30, 1986. Plaintiff was represented by Sam N. Pappas and William R. Russell, and the defendant was represented by Chris Wangsgard and David J. Jordan. The trial continued from day to day and concluded on May 2, 1986. Extensive evidence was presented by both sides, after which the matter was ably argued by counsel and the case taken under advisement. The Court has weighed and considered the evidence and arguments of counsel, and being fully advised, makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Defendant at all times material hereto had more than fifteen (15) employees for each working day in each of twenty (20) or more calendar weeks. Defendant operates a coal mine located in the vicinity of Scofield, Utah. Defendant's main administrative office is located at the town of Scofield. Defendant's mine is located approximately five (5) miles from Scofield.

2. Plaintiff was hired by the defendant as a Mine Clerk on or about December 22, 1980. She was hired by Walter Wright, who was her supervisor and at all times was the person to whom she reported. Mr. Wright was solely responsible for assigning plaintiff the job duties she was to perform.

3. A written "job description" of plaintiff's job originally existed which described the duties of the Mine Clerk. The document was not available at the trial, but testimony established that some of the duties required plaintiff as Mine Clerk to go to the Main Office even though her primary work assignment was at the Mine Office.

4. Plaintiff worked as a Mine Clerk for defendant until September 23, 1981, when she commenced a maternity leave.

5. Plaintiff went to the Main Office from time to time at the instructions of her boss, Mr. Wright, and used his truck as transportation to and from the Main Office for a period of time.

6. Prior to March 1981, Mr. Wright became dissatisfied with plaintiff's job performance in that he felt she was spending too much time at the Main Office and away from the Mine Office.

7. In March 1981, Mr. Wright admonished plaintiff that she was spending too much time at the Main Office away from her duties at the Mine Office.

8. During a mine strike, from March 27, 1981 to June 3, 1981, because of lack of work at the Mine Office, plaintiff was specifically assigned to the Main Office.

9. The weight of the evidence is that plaintiff continued to go down to the Main Office unnecessarily after she had been admonished not to do so, both before and after the mine strike.

10. Plaintiff became pregnant in June 1981.

11. In August 1981, plaintiff informed Mr. Wright that she was expecting and she submitted insurance claims for doctor visits in July and August 1981 to her employer.

12. On or about September 21, 1981, plaintiff notified defendant that her doctor had advised her to commence maternity leave because of "intrauterine pregnancy with a history of premature labor."

13. On September 21, 1981, Mr. Walter Wright made the decision to terminate plaintiff. Although Mr. Wright was aware that plaintiff was pregnant at the time, his decision to terminate her was based on his dissatisfaction with her job performance and was not based on the fact that she was pregnant. Mr. Wright immediately communicated his decision to terminate plaintiff to his boss, Mr. Haines, who concurred in the decision.

14. Mr. Wright and Mr. Haines decided that as a favor they would not actually terminate plaintiff on September 21, 1981, but would let her take maternity leave so she would be eligible for insurance benefits under the Company's program.

15. Plaintiff was out of the office for half a day on September 21, 1981. Her personnel record indicates that she was on "SS," or "sickness self" status that day, but the records indicate that she worked on September 22, 1981.

16. Prior to her taking maternity leave commencing September 23, 1981, plaintiff was not told and had no notice of Mr. Wright's decision to terminate her.

17. The decision to terminate plaintiff was not announced during her maternity leave or generally known by personnel of defendant because of a desire that she receive maternity benefits and on a belief that she might not return to work following the maternity leave.

18. Plaintiff was permanently replaced by Linda Greener in late September or early October 1981.

19. Plaintiff was given clearance by her doctor to return to work on April 18, 1982.

20. Plaintiff gave notice to defendant on April 1, 1982, of her intent to return to work on April 18, 1982.

21. Plaintiff was not told of the decision that she had been terminated and that she had been permanently replaced until April 9, 1982. Plaintiff was given and received notice of her termination on April 9, 1982. The termination notice was in the form of a blue slip which indicated that the reason for termination was "No Position Available."

22. A prior blue slip concerning plaintiff's termination had been prepared immediately prior to April 9, 1982, which gave as the reason for termination "Reduction in Force." That blue slip was not given to plaintiff, however, because a question had been raised as to the sufficiency of that reason and whether defendant in fact was eliminating a position. This resulted in confiscation of the said first blue slip and promulgation of the second blue slip which referred to "No Position Available."

23. The second blue slip which was given to plaintiff on April 9, 1982, was approved by Mr. Haines.

24. The explanations set forth in each of the blue slips were euphemistic in nature and not intentional lies.

25. The weight of the evidence is that plaintiff was terminated because Mr. Wright was dissatisfied with her job performance. At some time prior to or on September 21, 1981, it was clear that Mr. Wright did not want plaintiff to continue in the employ of defendant under any circumstances.

26. Plaintiff claimed that the following acts of sexual harassment occurred during the course of her employment:

a. On one occasion Mr. Wright invited plaintiff to accompany him to a professional football game in California. Plaintiff declined the invitation.

b. On another occasion Mr. Wright invited plaintiff to go to the company cabin for a drink. Plaintiff declined.

c. On another occasion Mr. Wright appeared in plaintiff's office to take a telephone call with only a towel wrapped around his waist. He suggested that she scrub his back, which she declined to do.

d. Mr. Wright persistently told explicit and suggestive jokes and stories in front of plaintiff even though plaintiff requested that he not do so.

e. Mr. Wright told plaintiff on one occasion that he dreamed of being with or married to a dark haired, slender woman like plaintiff.

27. The weight of the evidence is that the aforesaid alleged acts of sexual harassment were not intended as acts of harassment, and that in any event there was no causal connection between them and plaintiff's termination.

28. No credible evidence was submitted that shows that Mr. Wright was sexist or that he did not want to retain women in employment.

29. A woman was selected to replace plaintiff after plaintiff commenced her maternity leave.

30. No credible evidence was submitted that men were treated more favorably than women in regard to leaves of absence.

31. At the date of her hire, plaintiff was paid at the rate of $6.78 per hour. On or about June 30, 1981, plaintiff was given a raise from $6.78 per hour to $7.35 per hour. Mr. Wright recommended the raise.

## CONCLUSIONS OF LAW

1. Jurisdiction in this Court is not disputed and is determined to be present under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 28 U.S.C. §§ 2201, 2202 and 28 U.S.C. § 1343.

2. Venue is laid by the plaintiff in the Central Division of the District court of Utah, pursuant to 28 U.S.C. § 1393(a). Venue is not objected to and is determined by the Court to be proper.

3. At all times relevant hereto, defendant was an "employer" within the meaning of 42 U.S.C. § 2000e, et seq.

4. At all times relevant hereto, plaintiff was a person entitled to protection under 42 U.S.C. § 2000e et seq.

5. Plaintiff established a prima facie case of sex discrimination.

6. Defendant articulated legitimate nondiscriminatory reasons for plaintiff's termination.

7. Plaintiff failed to carry her burden of proof that the reasons give by defendant for termination were pretextual, and defendant is entitled to judgment in its favor.